**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0000045
30-NOV-2015
08:55 AM**

CAAP-13-0000045

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
McNEIL A. VALENCIA, Defendant-Appellant.


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-1576)

MEMORANDUM OPINION
(By: Nakamura, C.J., and Leonard and Ginoza, JJ.)

Plaintiff-Appellee State of Hawai'i (State) charged
Defendant-Appellant McNeil A. Valencia (Valencia) with attempted
second-degree murder. Valencia and the complaining witness,
Patrick Domingo (Domingo), were friends. The State's theory of
the case was that Valencia became angry and attacked Domingo with
a machete after Domingo publically accused Valencia of stealing
or selling Domingo's toolbox.[1] Domingo sustained significant
lacerations to the right side of his face, left ear, left collar
bone, and right palm. Valencia's theory was that he acted in
self-defense after Domingo attacked and cut him with a broken
beer bottle.

The charged incident occurred during a barbecue held at
the home of Romeo Ordonez (Romeo). Romeo, Domingo, and others
present at the barbecue, including several of those present who

---

[1] Domingo believed that Valencia had been involved in the theft or sale
of Domingo's toolbox because Domingo saw a third-party with his toolbox and
the third-party said that Valencia had sold the toolbox to him.

testified at trial, were friends with Valencia. Except for Valencia, all the eye-witnesses to the incident called at trial testified that Valencia initiated the assault, that Domingo did not possess any weapon, and that Valencia swung at and struck Domingo multiple times with a machete. None of these eye-witnesses supported Valencia's testimony that Domingo attacked and cut him with a broken beer bottle. In addition, no broken glass was observed by these eye-witnesses or by the police who arrived at the scene, Valencia did not complain of injuries at the time of his arrest, and Valencia's arrest photograph did not appear to show any tear in or blood on his shirt or clothing.

During the trial, the Deputy Prosecuting Attorney (DPA), without objection, asked two witnesses whether they had ever observed Domingo to be violent or aggressive. Both witnesses answered no. At the completion of trial, the jury found Valencia guilty of the lesser included offense of first-degree assault. The Circuit Court of the First Circuit (Circuit Court)[2] sentenced Valencia to ten years of imprisonment, and it filed its Judgement on January 15, 2013.

On appeal, Valencia raises only one point of error. Valencia argues that his first-degree assault conviction must be vacated because his trial counsel provided ineffective assistance by failing to object to the DPA's questions regarding Domingo's non-violent or non-aggressive character.

We affirm the Circuit Court's Judgment. Based on the other evidence presented of Valencia's guilt at trial, we conclude that the brief testimony relating to Domingo's non-violent or non-aggressive character did not affect the outcome of this case. Valencia failed to meet his burden of showing that the alleged error or omission of his trial counsel resulted in the withdrawal or substantial impairment of a meritorious defense. We therefore hold that Valencia failed to demonstrate

---

[2] The Honorable Rom A. Trader presided.

his entitlement to relief on his ineffective assistance of counsel claim.

BACKGROUND

I.

Romeo Ordonez was a friend and former neighbor of Valencia. Romeo had known Valencia for about ten years, and they were neighbors when they both lived on Colburn Street. Romeo was a car stereo installer and also worked as a DJ at weddings and parties. Valencia sometimes helped Romeo DJ at parties.

Romeo was also friends with Domingo, whose aunt lived on Colburn Street. Romeo had known Domingo for about ten years, and they first met when Domingo would come down to Colburn Street and "cruise with everybody." Romeo, Valencia, and Domingo all knew each other from Colburn Street, they were "all good friends," and they began "cruising" together after meeting on Colburn Street.

At the time relevant to this case, Romeo was living with his parents on ʻEluwene Street. Valencia also at some point in time lived on ʻEluwene Street, and while living there, he occasionally hung out with Romeo. Romeo would often invite people over to his ʻEluwene Street house for barbeques, which he would sometimes hold twice a week.

In the evening on October 26, 2011, Romeo held a barbecue at his house. Although Romeo had invited Valencia and Valencia had attended barbeques at Romeo's house on prior occasions, Valencia was not among the people invited to this particular barbecue. Among the people present were Romeo's cousin, Randall Ordonez, Jr. (Randall), Domingo, Domingo's girlfriend, Mary Ann Urbano (Mary Ann), Mary Ann's cousin, Dennis Urbano (Dennis), and Romeo's co-worker, Kevin Arucan (Arucan).

The barbecue began at about 6:30 p.m. At about 11:00 p.m., Valencia unexpectedly pulled up in front of Romeo's house driving a black Nissan truck. Romeo testified that Valencia stopped in the middle of the road, called Romeo over, and showed him a text on Valencia's phone. Valencia then proceeded to park

3

his truck parallel to Mary Ann's car, a white Camry. In the process, he almost hit Randall's car. When Valencia finished parking, there was a short distance, which Romeo estimated to be about four feet, between Valencia's truck and Mary Ann's car.

According to Romeo, Valencia exited his truck with a beer bottle in his hand. Domingo got up and asked Valencia, "Where's my toolbox?" Valencia responded that he did not know. Valencia, who was standing between his truck and the white Camry, then called Domingo to come over. Domingo, without anything in his hands, went over to Valencia. Romeo heard Valencia say, "You think you like act bad," and then Romeo saw Valencia bring out a machete and start swinging at Domingo.

Romeo testified that Valencia swung the machete at Domingo four or five times. Valencia hit Domingo with the first swing, which struck Domingo on the right side of his face and caused Domingo to drop to the ground. Valencia kept swinging the machete when Domingo was on the ground. The additional swings included those striking Domingo on the left side of his shoulder, striking Domingo on the ear, and missing Domingo and hitting the road, which left a mark on the roadway. Domingo crawled away from Valencia and ran into Romeo's house. Romeo's father came out of the house and told Valencia, "Enough already, go home[.]" Valencia then went back to his truck and drove away.

Romeo did not see any broken glass in the driveway in front of his house or in the area where Mary Ann's car was parked.

II.

Randall, who was 28 at the time of trial, testified that he had known Valencia for thirteen years and considered Valencia to be "a good friend." Before the incident on October 26, 2011, Randall used to hang out with Valencia, had invited Valencia over to his house for barbecues, and had no problems with Valencia. Randall had known Domingo for about two years and was friends with Domingo.

Randall testified that when Valencia arrived at Romeo's barbecue at about 11:00 p.m., Randall took a picture of Valencia because he had not seen Valencia for a while.  Randall knew a lot of people who knew Valencia and wanted to post a picture of his friend Valencia on his Facebook page.  Randall greeted Valencia, but Valencia did not reply and just ignored Randall.  To Randall, Valencia "looked like he was not all there" because normally Valencia would greet Randall.

According to Randall, Domingo asked Valencia, "Where's my tools?"  Valencia said he did not know, and Domongo said, "Don't lie, I know you know where my tools are.  I'll call the guy that you sold the tools to.  You know, just tell me the truth."  Valencia responded, "You want to act bad in front of everybody, huh?"

Randall testified that Valencia then pulled out a weapon.  Randall stated:

> At first I didn't know what it was.  Then he swung down towards [Domingo], and [Domingo] tried to take it away from him the first time and failed doing so.  So [Domingo] fell down to the floor, and then while on the floor, [Valencia] brought it up again, swinged [sic] it back down, but missed.  The second shot missed.  It caused a clang on the floor, a spark, and that's when I realized that that's not just a stick that he was trying to hit him with, it was a machete, because then I looked clearly at the weapon.  I was like, Oh, my God, it's a machete.
>
> Then he went back up again, struck him for the third and fourth time, actually got him.

Domingo crawled away from Valencia and went into the house.

Randall testified that Domingo was not armed in any way with a weapon when Valencia swung the machete at Domingo. Romeo's father told Valencia to leave and Valencia got into his truck and drove away.

III.

On direct examination in the State's case-in-chief, the DPA asked Romeo and Randall whether they had observed Domingo to be violent or aggressive.  Valencia's counsel did not object to the DPA's questions or the answers given by Romeo and Randall.

With respect to Romeo, the DPA elicited the following testimony:

Q.   Okay. You've known [Domingo] for about ten years?

A.   Yes, sir.

Q.   In those ten years have you ever seen [Domingo] to be physically aggressive towards anyone?

A.   No.

Q.   Have you ever seen [Domingo] to be violent towards anyone?

A.   No.

With respect to Randall, the DPA elicited the following testimony.

Q.   . . . [H]ow long have you known [Domingo]?

A.   Known [Domingo] almost two years now.

Q.   So you've known [Valencia] much longer than you've known [Domingo]; right?

A.   Yes, sir.

Q.   In the two years that you've known of [Domingo], have you ever seen him to be violent?

A.   No, sir.

Q.   What about aggressive?

A.   No.

On cross-examination of Randall, Valencia's counsel elicited Randall's opinion that Valencia was not violent:

Q.   Do you think [Valencia] is a violent kind of guy?

A.   No, honestly I don't think so.

Q.   Why is that?

A.   Since I've known him, he's always been happy-go-lucky.  He's always -- he just never seemed to me to be violent.

### IV.

Domingo testified that he had known Valencia for over ten years, that he knew Valencia from Colburn Street where his aunt used to live, and that he was thirteen years old when he

first met Valencia.  Valencia was part of Domingo's core group of friends, and Domingo would see Valencia about once a month.

At the time of trial, Domingo was 24 years old.  He worked as a laborer for the Laborer's Union and was required to have his own tools.  According to Domingo, prior to the incident, he sold his truck to "Ronald" who asked if he could borrow Domingo's toolbox.  Domingo allowed Ronald to borrow his toolbox, but Ronald never returned the toolbox.  Domingo later saw his toolbox in the possession of a person named "Boy," who was Domingo's friend.  Domingo asked Boy how he got the toolbox, and Boy said that Valencia sold it to him.

According to Domingo, when Valencia arrived at Romeo's house, Valencia parked his truck and "came down" with a beer. Valencia was giggling when he greeted Domingo and asked, "Oh, how you been [?]"  Domingo asked Valencia whether he had sold Domingo's toolbox, and Valencia said no.  Valencia then went back to his truck and called Domingo to come over.  Domingo thought Valencia was going to show him something because Valencia had just returned from the Philippines.  Domingo placed a beer bottle he had been holding on the trunk of Mary Ann's car and walked over to Valencia.  Domingo did not have anything in his hands as he approached Valencia, and Domingo denied smashing a beer bottle at any time.

When Domingo got close, Valencia pulled out what Domingo described as a "butcher knife" and swung it at Domingo, cutting the right side of his face.  Domingo recalled being struck three additional times by Valencia, while Domingo was on the ground.  The additional blows struck Domingo on his left ear, his collar bone, and on his right hand as he tried to block the knife.  Valencia stopped "chopping" at Domingo when someone threw a bottle, which distracted Valencia and allowed Domingo to run to the house.  At trial, Domingo displayed to the jury the scars he sustained to his face, left ear, left chest, and right hand.

V.

Domingo's girlfriend, Mary Ann, testified that she knew Valencia as "[her] boyfriend's friend" and had known Valencia for seven years. Mary Ann testified that Domingo did not have any weapon in his hands when Valencia brought out a knife and started "chopping [Domingo]." Domingo also had not threatened Valencia or challenged him to a fight before Valencia's attack. Mary Ann stated that after the assault, she observed that Domingo's "left ear was half off," his left collar bone was open, and he was covering the right side of his face with a t-shirt because he could not stop the blood.

VI.

Dr. Fredrick Yost, M.D., a trauma surgeon, testified that he treated Domingo after Domingo was taken by ambulance to the emergency room at Queen's Medical Center. Dr. Yost observed lacerations to Domingo's right face, left ear, left chest, and right hand. According to Dr. Yost, the laceration to Domingo's face was about 8 inches long, penetrated to the muscle layers, and constituted a major laceration. Dr. Yost indicated that the scar to Domingo's face would result in permanent disfigurement. Domingo's left ear was severed down to the cartilage, which left it "kind of flopping." The laceration to Domingo's left chest in the area of the left clavicle was about two inches long. It penetrated down to the bone and caused a little chip in the bone. The laceration to Domingo's right hand went down through the muscles.

VII.

Officer Sheldon Watts (Officer Watts) was dispatched to Romeo's residence on ʻEluwene Street at approximately 11:07 p.m. on October 26, 2011. Officer Watts arrived at the scene at about 11:10 p.m. Officer Watts testified that Domingo was bleeding profusely and that a group of six to eight people at the scene were "all hysterical." Domingo gave Officer Watts Valencia's name and described the truck he was driving. Vehicle registration checks revealed that Valencia had a black Nissan

Frontier pickup truck registered to him and also disclosed the truck's license plate number.

On October 26, 2011, at about 11:10 p.m., Officer Kimberly Chaney (Officer Chaney) while on duty received an APB (all points bulletin) for Valencia's truck. A short time later, she saw Valencia's truck drive past her location. Officer Chaney activated her blue light and the truck stopped. However, as Officer Chaney got out of her vehicle and approached the truck, the truck "took off." Officer Chaney pursued the truck and found it abandoned in the parking lot of an apartment complex. Officer Chaney's beat partner, Officer Terrance Hibbert (Officer Hibbert), arrived at the scene, and they began searching for the truck's driver.

Officer Hibbert, who was wearing his police uniform, saw Valencia. Officer Hibbert identified himself as a police officer and told Valencia to stop. Valenicia did not comply, but began walking in the other direction. Officer Hibbert grabbed Valencia and placed him on the ground. Officer Hibbert attempted to handcuff Valencia, who was not compliant. Eventually, Officer Hibbert, with the assistance of Officer Chaney, was able to handcuff Valencia.

Valencia was placed under arrest. Officer Hibbert testified that he did not see any injuries to Valencia and that Valencia did not complain of any injuries or ask for any medical treatment. Officer Chaney testified that she did not observe any injuries to Valencia. At the police station, Officer Chaney administered a breath alcohol test to Valencia. The test results revealed that Valencia's breath was 0.115 grams of alcohol per 210 liters of breath, which exceeded the legal limit of .08 for driving.

A photograph taken of Valencia at the police station after his arrest was introduced at trial. The photograph did not appear to show any blood stains or a rip on Valencia's shirt or clothing.

9

A machete was recovered from Valencia's truck and was introduced at trial.  A photograph of the machete next to a ruler was also introduced which showed that the machete had a handle approximately six inches long and a blade approximately twelve inches long.  The tip of the machete was bent.

### VIII.

Valencia called Dennis Urbano (Dennis) and Kevin Arucan (Arucan), who were both present at the October 26, 2011, barbecue, as witnesses in the defense case.  Dennis testified that he was twenty-two years old, that he had known Valencia for at least ten years from "Dole Middle School days," and that prior to October 26, 2011, he considered Valencia to be a friend.  According to Dennis, Valencia pulled out a machete and swung it at Domingo numerous times.  Domingo appeared dazed and fell to the ground, but Valencia "kept on bashing" Domingo.  Dennis saw Valencia hit Domingo with the machete in the face, ear, hand, and collarbone.  Dennis testified that "[Domingo] was all bloody.  At that point I wanted to cry because he was near death.  He was all bloody man[.]"

Dennis testified that in an attempt to stop Valencia's attack on Domingo, Dennis threw a beer bottle which hit Valencia in the back.  Dennis then tried to attract Valencia's attention away from Domingo by calling Valencia out and telling him to "[c]ome on, come here[.]"  As a result of Dennis's actions, Domingo managed to crawl away and go into the house.

Dennis testified that Domingo did not have anything in his hands when he was struck by Valencia.  The bottle Dennis threw at Valencia did not break, and there were no broken bottles on the ground.

Arucan testified that he worked with Romeo.  He did not personally know either Valencia or Domingo.  Arucan did not have a clear view of the incident between Valencia and Domingo because his view was blocked by a car.  From what he could see, Domingo did not have a weapon in his hands.  Arucan did not see any broken glass on the ground.

IX.

Valencia testified in his own defense. At the time of trial, Valencia was 26 years old. Valencia testified that he had known Domingo and Romeo for ten years, having met them while he lived on Colburn Street. At that time, the relationship between the three of them was good. Both Valencia and Domingo helped Romeo in his DJ business. Valencia admitted that Domingo and Romeo were his friends. He also admitted that others who were present at the October 26, 2011, barbecue, in particular, Randall, Randall's girlfriend, Dennis, and Valentine Ordonez, were his friends.

According to Valencia, in the evening on October 26, 2011, he was drinking beer at the house of his friend, Vincent Nosis (Nosis), in Waipahu. After leaving Nosis's house, Valencia drove to Romeo's house and got out of the truck. Domingo approached Valencia and accused Valencia of stealing Domingo's toolbox and selling it. Valencia was surprised by the accusations because he "didn't do it." Domingo then broke a beer bottle in front of Valencia, and Valencia noticed that Romeo, Randall, and Dennis were approaching him. Valencia was scared and went to his truck and grabbed a machete or bolo knife from his truck.

Valencia testified that Domingo swung the broken beer bottle at him and demonstrated by moving his hand at chest level. Valencia testified that Domingo cut him with the beer bottle and that he was bleeding. However, he did not bleed a lot and his clothes were not torn. In response to Domingo's attack, Valencia raised the bolo knife and Domingo grabbed the sharp edge of the knife. Valencia swung the bolo knife at Domingo, hitting Domingo. They struggled over the knife and both fell to the ground. During the struggle, the bolo knife "dropped to the ground." Domingo's friends attacked Valencia and threw bottles at him, which hit Valencia. Valencia stood up, tried to grab the keys from his pocket, heard Romeo's father tell him to go home,

11

got into his truck, and took off.  There was no car parked next to Valencia's truck that blocked him from leaving.

Valencia admitted that he tried to run from the police. Valencia explained that he tried to run because he thought there was another friend of Domingo that was chasing him.  Valencia also admitted that he told the police that he was not injured. Valencia testified that the specs of blood on his feet and legs when the police took his picture at the police station was Domingo's blood.

### X.

The State called Officer Watts in rebuttal.  Officer Watts arrived at Romeo's residence at 11:10 p.m. on October 26, 2011.  It was Officer Watts' job to secure the scene.  He did not see anyone sweeping the area or any broken bottles in the area.

### DISCUSSION

### I.

Valencia's sole contention on appeal is that his conviction must be vacated and a new trial granted because his trial counsel provided ineffective assistance.  Valencia bears the burden of establishing that his trial counsel provided ineffective assistance of counsel.  State v. Antone, 62 Haw. 346, 348, 615 P.2d 101, 104 (1980).  To meet this burden, Valencia must satisfy the following two-part test: (1) Valencia "must establish specific errors or omissions of [his trial] counsel reflecting counsel's lack of skill, judgment or diligence"; and (2) Valencia "must establish that these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense."  Id. at 348-49; 615 P.2d at 104.

Valencia argues that his trial counsel provided ineffective assistance by failing to object when the DPA asked Romeo and Randall whether they had ever observed Domingo to be violent or aggressive and both witnesses answered no.  Citing

12

Hawaii Rules of Evidence (HRE) Rule 404(a)(2) (Supp. 2014),[3/] Valencia asserts that evidence of Domingo's non-violent or non-aggressive character was inadmissible. He argues that his counsel's failure to object to such evidence deprived him of the right to effective assistance of counsel and entitles him to have his conviction overturned and a new trial.

Citing the commentary to HRE Rule 404 (1993), the State contends that Romeo's and Randall's testimony regarding Domingo's non-violent or non-aggressive character would have been admissible in rebuttal after Valencia testified that Domingo was the first aggressor. The State therefore contends that defense counsel's failure to object to Romeo's and Randall's testimony during the State's case-in-chief did not constitute ineffective assistance.

## II.

We need not decide whether evidence of Domingo's non-violent or non-aggressive character was inadmissible. Assuming that such evidence was inadmissible in the State's case-in-chief and in rebuttal, we conclude that given the overwhelming evidence that Valencia was the first aggressor and did not act in self-defense, the failure of Valencia's counsel to object to this character evidence had no effect on the outcome of this case. Valencia has not established that he is entitled to relief on his ineffective assistance of counsel claim.

---

[3/] HRE Rule 404(a)(2) provides:

(a) Character evidence generally. Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

. . . .

(2)    Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]

There was overwhelming evidence that Valencia was the first aggressor and did not act in self-defense. Except for Valencia, all the eye-witnesses to the incident called at trial testified consistently that Valencia was the first aggressor, that Domingo was not carrying or armed with any weapon, and that Valencia struck Domingo several times with a machete, including while Domingo was down on the ground. Romeo, Randall, Dennis, and Domingo were all long-time friends of Valencia. Indeed, even Valencia testified that these individuals were his friends. Yet they all testified that Valencia initiated the assault by grabbing a machete and striking Domingo; they all refuted Valencia's claim that Domingo swung at Valencia with a broken beer bottle by testifying that Domingo did not have any weapon or thing in his hands when he approached Valencia.

In addition to the eye-witness testimony, Valencia's claim of self-defense was refuted by the objective evidence. Valencia claimed that Domingo swung a broken bottle at him at chest level and opened a cut which was bleeding. However, the arrest photograph of Valencia introduced at trial did not appear to show any blood stain or tear in his shirt or clothing. Officers Hibbert and Chaney, who arrested Valencia, testified that they did not observe any injuries on Valencia, and Officer Hibbert testified that Valencia did not complain of any injuries. Valencia also admitted that he told the police he was not injured. Officer Watts, who was responsible for securing the scene, did not see any broken bottles and other eye-witnesses also denied seeing any broken bottles or glass.

The use of deadly force in self-defense is not justified if the "actor knows that he can avoid the necessity of using such force with complete safety by retreating[,]" except that generally the "actor is not obliged to retreat from his dwelling or place of work[.]" Hawaii Revised Statutes § 703-304(5) (2014). In this case, it was undisputed that there was nothing blocking Valencia's truck from leaving and that the incident did not take place at Valencia's dwelling or work place.

The State also presented evidence that Valencia was drunk and that he displayed consciousness of guilt by attempting to flee from the police.  Valencia's explanation for fleeing -- that he thought a friend of Domingo was chasing him -- made no sense and did not provide a rational reason for him to run from the police.

The testimony elicited by the State of Domingo's non-violent and non-aggressive character was brief, and the State did not rely on this character evidence in its closing argument.

Under these circumstances, we conclude that there is no reasonable possibility that the brief testimony relating to Domingo's non-violent or non-aggressive character contributed to Valencia's conviction or had any bearing on the outcome of this case.  We conclude that even without this character evidence, the jury would have found Valencia guilty of first-degree assault.  Accordingly, Valencia failed to meet his burden of showing that the alleged error or omission of his trial counsel in failing to object to this evidence resulted in the withdrawal or substantial impairment of a potentially meritorious defense.  See Antone, 62 Haw. at 348-49, 615 P.2d at 104.  We therefore hold that Valencia has failed to demonstrate his entitlement to relief on his ineffective assistance of counsel claim.

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

DATED:  Honolulu, Hawai'i, November 30, 2015.

On the briefs:

William H. Jameson, Jr.
Deputy Public Defender
Attorney for Defendant-Appellant

Stephen K. Tsushima
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*
Chief Judge

Associate Judge

Associate Judge

15